William ETCHIESON, Plaintiff–Appellant,

v.

CENTRAL PURCHASING LLC, d/b/a Harbor Freight Tools; and Harbor Freight Tools, USA, Inc., d/b/a Harbor Freight Tools, Defendants–Appellants,

and

Precision Mastech Enterprises, Co. of Hong Kong, China, Defendant–Appellee.

No. 09CA0218.

Colorado Court of Appeals, Div. A.

April 15, 2010.

302

Gaddis, Kin, Herd & Craw, P.C., Gary S. Craw, Colorado Springs, Colorado, for Plaintiff–Appellant.

Kane Law Firm, P.C., Mark H. Kane, Colorado Springs, Colorado, for Defendants–Appellants.

No Appearance for Defendant–Appellee.

Opinion by Chief Judge DAVIDSON.

In this product liability action, plaintiff, William Etchieson, and defendant Central Purchasing, LLC appeal from the trial court's judgment dismissing defendant Precision Mastech Enterprises Co. (Precision), for lack of personal jurisdiction under C.R.C.P. 12(b)(2). The facts relevant to the issue of personal jurisdiction were found by the trial court after an evidentiary hearing and are not disputed. We conclude that Precision is subject to personal jurisdiction in Colorado and, therefore, we reverse and remand.

## I. Background

In his complaint, plaintiff sought compensation for injuries he incurred when an electric meter manufactured by Precision exploded. Precision is a Chinese company with no offices, employees, or facilities in the United States. Precision sold some of its electric meters, including the one that allegedly injured plaintiff, to Central Purchasing, a California company with its principal place of business in California. Central Purchasing sold some of the electric meters under the name Harbor Freight Tools throughout the United States through catalog and internet sales, and sold others to a separate entity, Harbor Freight Tools, USA, Inc. Harbor Freight Tools, USA is a Delaware corporation that is owned by some of the same individuals who own Central Purchasing and that operates Harbor Freight Tools retail stores throughout the United States, including the one in Colorado where plaintiff purchased the allegedly defective meter. The meter in question was manufactured by Precision in China, sold to Central Purchasing, sold to Harbor Freight Tools, USA, and, finally, sold to plaintiff.

Precision revised its product to serve the United States market, including by stamping "Cen–Tech," Central Purchasing's trademark, on the meters it sold to Central Purchasing. It advertised its products to the United States market through publications with nation-wide distribution. It knew that Central Purchasing sold the meters throughout the United States. However, Precision did not make any revisions or aim any advertising exclusively at Colorado and no Precision personnel ever visited Colorado.

Precision did not sell the Cen–Tech stamped meters directly to anyone in Colorado. It did, however, sell a different model of electric meter to the Rozek Company, a corporation with its principal place of business in Colorado. Precision has been selling meters to Rozek for ten years and its Rozek sales have generated $10,000 to $47,000 per year in revenue. Precision participated in arranging shipment of the Rozek meters to Colorado.

Based on these facts, the court granted Precision's motion to dismiss for lack of personal jurisdiction, determining that Precision's contacts with Colorado were insufficient to constitute minimum contacts. Contending that the court's ruling was erroneous, plaintiff and Central Purchasing filed this appeal.

## II. Standard of Review

■ When, as here, a trial court holds an evidentiary hearing to resolve a C.R.C.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Archangel Diamond Corp. v. Lukoil,* 123 P.3d 1187, 1192 (Colo.2005). When the facts are disputed, we reverse the trial court's findings only if they are clearly erroneous. Here, however, because the facts are undisputed, the trial court's determination regarding personal jurisdiction is a question of law, which we review de novo. *See Union Pac. R.R. v. Equitas Ltd.,* 987 P.2d 954, 957 (Colo.App.1999).

## III. Due Process: Minimum Contacts, Fair Play, and Substantial Justice

■ A plaintiff who seeks to invoke a Colorado court's personal jurisdiction over a nonresident defendant such as Precision must comply with both Colorado's long-arm statute, section 13–1–124, C.R.S.2009, and the due process requirements of the United

States Constitution. *Archangel,* 123 P.3d at 1193. However, because Colorado's long-arm statute extends jurisdiction to the maximum limits allowed by due process, *Keefe v. Kirschenbaum & Kirschenbaum, P.C.,* 40 P.3d 1267, 1270 (Colo.2002), we note that here there is statutory long-arm jurisdiction for the alleged commission of a tortious act, *see* § 13–1–124(1)(b), C.R.S.2009, and proceed directly to determining whether exercising jurisdiction over Precision is consistent with due process.

■ Due process prohibits a state's exercise of personal jurisdiction over a nonresident defendant unless the defendant has "certain minimum contacts with the forum state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Goettman v. North Fork Valley Restaurant,* 176 P.3d 60, 67 (Colo.2007) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■ Personal jurisdiction may be either general or specific. General jurisdiction permits a court to exercise jurisdiction over any dispute, even one arising from non-forum contacts, but only when the defendant has had "continuous and systematic general business contacts." *Archangel,* 123 P.3d at 1194 (quoting *OMI Holdings, Inc. v. Royal Ins. Co.,* 149 F.3d 1086, 1091 (10th Cir.1998)). Specific jurisdiction permits the court to exercise jurisdiction only over claims that "arise out of or relate to" the defendant's contacts with the forum. *Keefe,* 40 P.3d at 1271 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Because specific jurisdiction is so limited, the defendant's contacts are sufficient to support it so long as it has "purposefully availed" itself of the privilege of conducting activities in the forum state. *Archangel,* 123 P.3d at 1194. Here, because it is dispositive, we address only specific jurisdiction.

## A. Minimum Contacts

■ In determining whether Precision has purposefully availed itself of the privilege of conducting activities in Colorado, we consider only those contacts out of which plaintiff's claim arises or to which it relates. *See, e.g., Keefe,* 40 P.3d at 1271.

## 1. What Constitutes Purposeful Availment?—An Open Question

Plaintiff and Central Purchasing contend that *Alliance Clothing Ltd. v. District Court,* 187 Colo. 400, 532 P.2d 351 (1975), in which the court exercised specific jurisdiction under similar facts, is controlling. There, the plaintiff sought personal jurisdiction over a Hong Kong manufacturer of allegedly defective ski pants. The manufacturer had sold the pants to another Hong Kong corporation, which had in turn sold them to a Colorado corporation, which had sold the pants to the plaintiff in its retail store in Colorado. The court reasoned that because the use of the ski pants in Colorado was foreseeable and the plaintiff was injured in Colorado, jurisdiction was proper. *Id.* at 402–07, 532 P.2d at 352–54. *Alliance* has never been overruled and we agree that it is highly supportive of plaintiff and Central Purchasing's argument; however, subsequent United States Supreme Court decisions cast some doubt on its continued validity.

In *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the United States Supreme Court concluded that a defendant that sold cars in only a few northeastern states had not established minimum contacts in Oklahoma merely because the mobile nature of the cars made it foreseeable that consumers would eventually drive some of them to Oklahoma. The Court rejected the notion that "[t]he foreseeability that is critical to due process analysis is ... the mere likelihood that a product will find its way into the forum [s]tate" (as had the ski pants in *Alliance* ) and held that what is critical instead is the foreseeability of being haled into court in the forum state. *Id.* at 297, 100 S.Ct. 559. Thus, the Court said, a defendant must purposefully avail itself of the forum, for example by "deliver[ing] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum [s]tate." 444 U.S. at 298, 100 S.Ct. 559.

However, a few years later, in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Court called into question, but left unresolved, the test articulated in *World–Wide Volkswagen.* In *Asahi,* a product liability suit alleging defects in a tire manufactured by a Taiwanese company using valves manufactured by a Japanese company, the Court unanimously agreed that it would be unreasonable for a California court to exercise personal jurisdiction over the indemnification claim between the two companies, the only remaining dispute. However, it split into two pluralities on whether placing goods into the stream of commerce knowing some would be sold at retail in California constituted sufficient minimum contacts. Justice O'Connor's plurality concluded that more was required (for example, "designing the product for the [forum state] market," "advertising," "providing regular advice to customers," or "marketing through a distributor ... in the forum [s]tate"), *id.* at 112, 107 S.Ct. 1026; Justice Brennan's concurrence determined that placing goods into the stream of commerce knowing some would reach the forum state through its regular course was sufficient. *Id.* at 117, 107 S.Ct. 1026.

For decades now, both federal and state courts have had varied reactions to *Asahi:* some have adopted the O'Connor plurality's "stream of commerce plus" test, *e.g. Bridgeport Music, Inc. v. Still N the Water Publ'g,* 327 F.3d 472 (6th Cir.2003); others have followed the Brennan plurality or continued to follow *World–Wide, e.g. Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 614 (8th Cir.1994) (following *World–Wide* and concluding that *Asahi* stands only for the narrow proposition that it is unreasonable to adjudicate third-party litigation between two foreign companies in this country, but noting that "[s]hould one engage in vote counting ... it appears that five [J]ustices agreed that [placing] ... products into the stream of commerce with knowledge that the product would be distributed into the forum state represents sufficient minimum contacts"); and still others have avoided the question by concluding that jurisdiction is proper under either test. *See, e.g., Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d

1534 (11th Cir.1993). *See generally and compare* D. Owen, S. Madden & M. Davis, 2 *Madden & Owen on Products Liability* § 29:11 (3d ed.2000) (concluding that applying the stream of commerce test is perilous), *with* Kristen R. Baker, Comment, *Product Liability Suits and the Stream of Commerce after* Asahi: World–Wide Volkswagen is *Still the Answer,* 35 Tulsa L.J. 705 (2000).

In Colorado, the supreme court has not yet directly addressed the controversy, *see Goettman,* 176 P.3d at 71 (citing *Asahi* only in discussion of reasonableness); *Archangel,* 123 P.3d at 1194 (citing *Asahi* in discussion of reasonableness and for general proposition that defendant must purposefully avail itself of forum); *Classic Auto Sales, Inc. v. Schocket,* 832 P.2d 233 (Colo.1992) (not citing *Asahi),* although we surmise by its relative silence that it agrees with the reasoning of courts such as the Eighth Circuit in *Barone* that read *Asahi* narrowly and conclude that *World–Wide Volkswagen* is still the operative test. We note, however, that in *Union Pacific R.R.,* 987 P.2d at 957, a division of this court cited (but did not analyze or discuss) the "stream of commerce plus" test.

### 2. Minimum Contacts: Application

We conclude, based on two separate sets of facts, that even the more stringent requirements of Justice O'Connor's "stream of commerce plus" test are met here. Necessarily, then, the less stringent "stream of commerce" test is also met and we need not decide the impact, if any, of the *Asahi* decision on the "purposeful availment" prong of the minimum contacts test.

#### a. Contacts Through Central Purchasing

First, we conclude that the required minimum contacts under the "stream of commerce plus" test were established through Precision's Central Purchasing contacts.

##### i. Plaintiff's claim "arises out of" Precision's sales to Central Purchasing.

 Plaintiff's claim "arises out of or relates to" Precision's Colorado contacts through its sales to Central Purchasing be-

cause those contacts are alleged to have proximately caused plaintiff's injury by bringing the electric meter that actually injured him into his possession.

ii. Precision's contacts meet the "stream of commerce plus" test.

██ These contacts show that Precision did "something more" than place the Cen–Tech meters into the stream of commerce with the expectation that some would be purchased by Colorado consumers. Unlike the foreign defendant in *Asahi*, Precision did not simply manufacture a component part of a product that was assembled by a separate entity; it manufactured the finished electric meters, complete with packaging and the Cen–Tech branding. Unlike the *Asahi* defendant, it altered its meters specifically for the United States market (including Colorado) and advertised its meters in publications distributed throughout the United States (including Colorado). It was specifically informed that Central Purchasing sold the meters throughout the United States (including Colorado, although Colorado was not specifically mentioned). Although Precision and Central Purchasing contracted to pass the risk of loss once the meters were placed on the ship in Hong Kong, Precision participated in arranging for shipping to California and South Carolina for distribution throughout the United States. Moreover, plaintiff's claim is not simply one for indemnification, but for recovery of damages for a tort allegedly committed in Colorado by Precision. *See Goettman*, 176 P.3d at 69 ("We have previously held that the commission of a tort, in itself, creates a sufficient nexus between a defendant and the forum state that satisfies the due process inquiry ...." (citing *Classic Auto Sales*, 832 P.2d at 237)).

Although the trial court thought otherwise, simply because these activities were directed toward the United States market generally rather than toward the Colorado market exclusively did not make Precision's availment of the benefits of the Colorado market any less purposeful. *Cf. Le Manufacture Francaise Des Pneumatiques Michelin v. District Court*, 620 P.2d 1040, 1045 (Colo.1980) (personal jurisdiction was proper based on French company's purposeful availment of United States market and admission that use of product was foreseeable "anywhere in the United States, including Colorado").

██ Neither *Asahi* nor any other precedent requires a court to exclude from consideration a nonresident defendant's actions relating to a forum simply because those actions also constituted availment of other forums. To the contrary, as other courts have determined, it is proper to consider contacts with the United States market as a whole in assessing whether a defendant had established minimum contacts with a particular state. *See Vermeulen*, 985 F.2d at 1549 (because defendant designed car for American market and made it "the subject of a nationwide advertising campaign," it had minimum contacts to support jurisdiction in product liability case in Georgia); *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1196 (9th Cir.1988) (advertisements in *Town & Country* and the *Wall Street Journal* constituted advertising in California); *Dall v. Kaylor*, 163 Vt. 274, 658 A.2d 78, 80 (1995) (defendant established minimum contacts in Vermont by advertising "in a national market that included Vermont").

Indeed, excluding regional or national contacts in considering minimum contacts in product liability cases could allow any foreign-nation manufacturer that marketed and sold its products throughout the United States to avoid being haled into a state court anywhere in the country, thus impairing the states' ability to protect their respective citizens from injury from defective products, simply by refusing to tailor its product specifically to any state. *Cf. Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 726–27 (Colo.2010) (strict products liability is "premised on the concept of enterprise liability for casting a defective product into the stream of commerce" (quoting *Smith v. Home Light & Power Co.*, 734 P.2d 1051, 1054 (Colo.1987))).

██ Here, the facts show without question that, by advertising and tailoring the model of electric meter that allegedly injured plaintiff to the United States as a whole and knowing that meter was being sold throughout the United States, Precision purposefully availed itself of the United States market.

Under these facts, because it purposefully availed itself of the general markets of the United States, including Colorado, we conclude that Precision also purposefully availed itself of the Colorado market.

### b. Contacts Through Rozek

In addition to establishing minimum contacts through its Central Purchasing-based Colorado contacts, we conclude that Precision also, independently, established minimum contacts through its Rozek-based contacts.

#### i. Plaintiff's claim "relates to" Precision's sales to Rozek.

Precision also sold a different model of electric meter (that did not include the Cen-Tech branding) directly to a Colorado customer, Rozek, a corporation with its principal place of business in Colorado. The trial court refused to consider these facts in assessing specific jurisdiction solely because "[p]laintiff's alleged injuries do not arise out of those contacts."

Because it was a slightly different model of electric meter, we agree that plaintiff's injuries did not arise out of, in the sense of being caused by, Precision's sales of those meters to Rozek. However, we consider the proper inquiry to be somewhat broader: whether the plaintiff's injuries "arise out of *or relate to*" the defendant's contacts. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174 (emphasis added); *accord Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Keefe,* 40 P.3d at 1271.

■ A sufficient nexus exists to satisfy the "related to" standard if the claim is "substantially connected with" or has some "discernible relationship" to the defendant's contacts with the forum. *See Shoppers Food Warehouse v. Moreno,* 746 A.2d 320, 335 (D.C.2000). That is, a cause of action "arises out of or relates to" a defendant's activities in the forum if it was reasonably foreseeable that as a result of those activities the defendant could be sued in the forum on a cause of action similar to that brought by the plaintiff.

*Id.* at 336; *see Thomason v. Chemical Bank,* 234 Conn. 281, 661 A.2d 595, 603 (1995).

■ Here, plaintiff's alleged injury "relate[s] to" Precision's contacts through selling electric meters to Rozek because it was reasonably foreseeable that Precision could be sued in Colorado for selling defective electric meters to or through Rozek, and plaintiff's suit is based on Precision's sales of allegedly defective electric meters.

Accordingly, we consider the Rozek contacts in assessing whether it is proper for Colorado to exercise specific jurisdiction. *See Shoppers Food Warehouse,* 746 A.2d at 335–36 (defendant's advertisements in the *Washington Post* to solicit D.C. residents were contacts related to D.C. resident's slip and fall in Maryland store, even though there was no indication she ever saw the advertisements); *Chew v. Dietrich,* 143 F.3d 24, 30 (2d Cir.1998) (decedent's injury while sailing from Barbados to Rhode Island related to defendant's recruitment of a crew, including decedent, to sail from Rhode Island to Barbados with the expectation that most, though not necessarily decedent, would also accompany him on the return voyage); *cf. Le Manufacture Francaise,* 620 P.2d at 1046 (considering defendant's sales to companies that sold tires at retail in the United States even though tire alleged to have caused injuries was sold at retail in Germany).

#### ii. Precision's contacts with Rozek meet the "stream of commerce plus" test.

■ We conclude that these contacts with Rozek also, and independently, support exercising specific jurisdiction. Rozek has its principal place of business in Colorado. Precision's sales of its electric meters to Rozek stretched over a period of ten years and Precision derived significant revenues from them, from $10,000 to $47,000 per year. Although Precision and Rozek agreed to pass the risk of loss for the meters when they were "free on board" the ship in Hong Kong, Precision participated in arranging for shipment to Colorado.

### B. Reasonableness

■ Although we have concluded that Precision had the requisite minimum con-

tacts, in order to comport with the requirements of due process we must also determine whether exercising personal jurisdiction over Precision comports with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154; *Goettman*, 176 P.3d at 71. To do so, we balance the inconvenience to Precision of being forced to defend in a foreign judicial system against Colorado's interests in protecting its residents from harm and plaintiff's interest in obtaining relief. *See World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 559; *Archangel*, 123 P.3d at 1195. We conclude that subjecting Precision to litigation in a Colorado court does not offend traditional notions of fair play and substantial justice.

First, we note that in the context of product liability, the limits on personal jurisdiction have been relaxed as trade has nationalized (and, more recently, globalized) and as modern transportation and communication have eased the burden of defending oneself in a distant state where one engages in economic activity. *See World–Wide Volkswagen*, 444 U.S. at 293, 100 S.Ct. 559. Although the "unique burdens" of defending oneself in a foreign legal system have "significant weight in assessing the reasonableness of stretching the long arm ... over national borders," when minimum contacts exist "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114, 107 S.Ct. 1026 (noting that in that case, the plaintiff's and forum's interests in adjudicating an indemnification claim between two alien corporations were slight); *see Goettman*, 176 P.3d at 71.

Further, although litigating anywhere in the United States may be a significant burden on a Chinese company such as Precision, there is no indication that doing so would be any more or less burdensome in Colorado than in any other state. Colorado has a strong interest in ensuring that manufacturers do not sell dangerous products that injure its citizens. *See Boles v. Sun Ergoline, Inc.* 223 P.3d at 727 ("[S]trict products liability evolved to accommodate, and is driven by,

public policy considerations surrounding the relationship between manufacturers and consumers in general, rather than any particular transaction or contract for sale."); *see also Goettman*, 176 P.3d at 71 (Colorado has a strong interest in ensuring the safety of those traveling on its roads); *cf. Asahi*, 480 U.S. at 114, 107 S.Ct. 1026 (noting that because neither of the remaining parties was a resident of California, its interests were "considerably diminished").

Finally, plaintiff's interest in obtaining relief is strong, and his interest in adjudicating in Colorado is substantial because it is unlikely that Precision is subject to general jurisdiction in any other state; thus, if he cannot do so in Colorado, plaintiff might be unable to pursue relief against Precision in any jurisdiction other than, perhaps, China. *See Goettman*, 176 P.3d at 71. It is inconsistent with Colorado public policy that plaintiff be forced to bear that burden after being injured by an allegedly defective product he purchased in Colorado, particularly since Precision has, for many years, received the benefit of selling its products here. *Cf. Boles*, 223 P.3d at 726–28 (voiding as against public policy an exculpatory agreement between manufacturer and consumer whose only benefit is the right to have or use the product).

## IV. Conclusion

We conclude that the trial court erred in determining that it had no specific jurisdiction over Precision even under the "stream of commerce plus" test. Based on this disposition, we do not address any of the parties' remaining arguments.

The judgment of dismissal is reversed and the case is remanded for reinstatement of plaintiff's complaint against Precision and for further proceedings as necessary.

Judge STERNBERG * and Judge PLANK * concur.

---

* Sitting by assignment of the Chief Justice under

provisions of Colo. Const. art. VI, § 5(3), and